IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 5, 2020

**LARRY DONNELL GOLDEN, JR. v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Carroll County**
**No. 14-CR-49          Donald E. Parish, Judge**

————————————————————

**No. W2019-01531-CCA-R3-PC**

————————————————————

Petitioner, Larry Donnell Golden, Jr., appeals from the denial of his petition for post-conviction relief from his 2016 convictions for second degree murder and reckless endangerment. Petitioner contends that he received the ineffective assistance of counsel at trial and on direct appeal. Following our review of the record, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ALAN E. GLENN, and D. KELLY THOMAS, JR., JJ., joined.

Jasmine McMackins Hatcher, McKenzie, Tennessee, for the appellant, Larry Donnell Golden, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Katherine K. Decker, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Carthel L. Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Procedural history*

Petitioner's convictions resulted from the shooting death of Houston Dewayne Brown. A panel of this court affirmed Petitioner's convictions and sentences on direct appeal. The panel summarized the facts underlying Petitioner's convictions as follows:

> The proof at trial showed that Houston Brown and his fiancée, Sharmaine Algee, hosted a Super Bowl party on February 2, 2014. An

argument broke out between two of the attendees, Jermaine Crawford and Shemile Adams. Mr. Adams pinned Mr. Crawford against the wall during the course of a verbal argument about a possible sexual assault committed by Mr. Crawford sometime earlier. Ms. Algee asked Mr. Crawford to leave, and Mr. Crawford went to Dorothy Williams' house across the street.

Ms. Algee determined that Mr. Adams might have been mistaken about Mr. Crawford, so she and Mr. Adams went across the street to Ms. Williams' home to apologize to Mr. Crawford. Mr. Crawford told them, "I'm not trying to hear that shit. It's all about to be handled." Ms. Williams later went to Ms. Algee's house and told her that she had overheard Mr. Crawford on the phone telling someone to "come strapped up," meaning armed, but Ms. Algee did not take Ms. Williams' information seriously.

Sometime later, [Petitioner], Cedric Harris, and Jermaine Crawford showed up in Ms. Algee's and Mr. Brown's front yard. Mr. Brown, Mr. Adams, and Landon Gilbreath went outside to meet them, and Mr. Brown told [Petitioner] and the two men with him "that he couldn't have this at his house because he was on parole and he couldn't afford for the police to be there." However, Mr. Adams and Mr. Harris started fighting. Ms. Algee saw that [Petitioner] had a gun in his pocket and went back inside to call the police. While Ms. Algee was on the phone with the dispatcher, several gunshots sounded. After the gunfire stopped, it was discovered that Mr. Brown had been fatally wounded.

Landon Gilbreath saw Mr. Adams and Mr. Harris exchanging words in the yard before fighting each other. [Petitioner] was on the other side of the cars parked in the driveway. Mr. Harris fell to the ground, and when Mr. Adams hit or kicked him, Mr. Harris screamed something. After that, [Petitioner] began firing. Mr. Gilbreath heard Mr. Brown say, "I'm hit," and then everyone "scattered."

Ja'Leesa Cherry, who testified for [Petitioner], said that Mr. Harris was down on the ground and Mr. Adams was kicking him. Mr. Harris yelled, "Shoot," after which Ms. Cherry saw flashes coming from where [Petitioner] was standing and heard Mr. Brown say that he had been shot.

- 2 -

Mr. Adams, who also testified for [Petitioner], said that his confrontation with Mr. Crawford at the Super Bowl party was motivated by an incident several nights earlier at a nightclub between Mr. Adams's girlfriend and Mr. Crawford. Mr. Adams admitted pushing Mr. Crawford during the confrontation at the party but then went across the street to apologize to him. Sometime after returning to Mr. Brown's house from apologizing to Mr. Crawford, Mr. Adams heard Mr. Brown "ranting and raving" about Mr. Crawford. Mr. Adams said that a short time later Mr. Brown and others left in a hurry when they saw a group of men, including [Petitioner] and Mr. Harris, approaching the front yard. Mr. Adams and Mr. Harris exchanged words and began fighting. Mr. Adams admitted to kicking Mr. Harris in the face while Mr. Harris was on the ground. When Mr. Adams kicked Mr. Harris in the head a second time, Mr. Harris yelled "shoot."

[Petitioner] did not introduce any evidence at trial refuting the fact that he fired a firearm during the altercation on February 2, 2014. The State presented proof that the Defendant made statements to several of his cellmates after he was taken into custody, in which he admitted to firing shots. In particular, [Petitioner] told one cellmate that he went to a party where a fight was taking place between rival gangs and "that he had to do what he had to do."

Five shell casings, all fired from the same gun, were found in the yard and driveway of the residence. Three bullets, as well as apparent bullet holes, were found in areas inside and outside the home. It was stipulated that Mr. Brown died from a gunshot wound to the chest.

*State v. Larry Donnell Golden, Jr.*, No. W2016-01512-CCA-R3-CD, 2017 WL 2482992, at *1-2 (Tenn. Crim. App. June 7, 2017), *perm. app. denied* (Tenn. Oct. 4, 2017).

The trial court sentenced Petitioner to concurrent sentences of 23 years for his murder conviction and 4 years for his reckless endangerment conviction. Petitioner timely filed a petition seeking post-conviction relief, alleging that his trial counsel was ineffective.

### Post-conviction hearing

Trial counsel testified that he represented Petitioner from Petitioner's arraignment in February, 2014, through his direct appeal. Trial counsel met with Petitioner several times prior to trial. Trial counsel testified that his primary trial strategy was to "negate [ ]

premeditation." Trial counsel's theory of the case was "[e]ssentially, that a fight erupted, [Petitioner]'s friend is getting the worst end of the fight. He pulled a firearm to protect his friend and that was that." Trial counsel was "pleased" that Petitioner was convicted of the lesser-included offense of second degree murder, but he testified, "I would have liked to do better." Trial counsel testified that because Petitioner admitted to having "pulled the trigger that resulted in the death of the victim[,]" trial counsel did not expect an acquittal.

Trial counsel testified that he considered the theory of defense of a third party to be "a viable trial strategy," but he testified, it was not "the paramount part of [his] strategy[.]" Trial counsel did not "go into great depth" on the theory of defense of a third person with Petitioner because he did not believe that the facts supported the defense. Trial counsel testified that he explained to Petitioner that a third party defense theory was "a very difficult legal concept to even get around to" and that confusing the jury would not be a good trial strategy.

Trial counsel testified that because Petitioner and his friends instigated the altercation, it was his "position that [Petitioner] didn't avail himself of the [d]efense of the [t]hird [p]arty[.]" Trial counsel also explained that the victim was not involved in the fight. He testified, "the force was not used against the person doing the beating, namely Shemile Adams." Trial counsel nevertheless requested a jury instruction on the third party defense to provide a "lower rung on the ladder to shoot for." Trial counsel called Shemile Adams to testify as a witness at Petitioner's trial. Trial counsel recalled that Mr. Adams testified that Mr. Harris was "completely disabled on the ground when [Mr. Adams] kicked him the last time." Trial counsel testified, "I believe we even got him to testify that he kicked him one more time after he heard the first shot."

Trial counsel identified issues to be determined prior to trial and filed pretrial motions, including a motion to suppress testimony regarding "test results" from investigators at the crime scene to determine the projection of the bullets. Trial counsel testified that investigators at the crime scene "took what they considered to be ballistics by taking strings from where they thought the shooter was, and from where they found bullet holes in certain areas around the property[.]" He testified that Investigator Johnny Hill "was going to testify that based on this test he performed, that [Petitioner] was not shooting aimlessly into the crowd, that he was specifically taking line shots at people standing in the crowd[.]" Trial counsel testified that he did not believe the investigator was qualified to give that testimony.

Trial counsel testified his objective in filing the motion was to exclude photographs of the strings used to determine the trajectory of the bullets and Investigator Hill's "theory behind what the strings represent[ed]." Trial counsel waited to file the

motion until two weeks prior to trial "because . . . it doesn't give the State the chance" to obtain expert crime scene analysis in the event the trial court granted relief to Petitioner. Trial counsel testified that he believed that the late filing of the motion benefitted Petitioner. Trial counsel's motion was granted. Investigator Hill testified at trial about the location of the bullets; however, he was not permitted to testify that Petitioner targeted the victim. During his cross-examination of Investigator Hill, trial counsel attempted to establish that Petitioner was "just shooting in the air, shooting wildly about."

Trial counsel consulted an independent investigator and discussed possible reconstruction of the crime scene, but he testified, "[i]f we would [have] had our expert go look at the scene, they would have come up with similar results to [Investigator] Hill, in my opinion, showing the travel of the bullets." Trial counsel testified, "[t]he whole idea was to keep that completely out." Trial counsel testified, "I can see no way that the path of the travel of bullets on these strings help[ed] our case."

Trial counsel testified that he also filed a motion to suppress the testimony of Dorothy Williams that she overheard a phone call in which Mr. Crawford told Mr. Harris to "get over here and make sure you strap up." Trial counsel testified that he filed the motion as late as possible so that if it was granted, the State would not have an opportunity to seek another avenue to introduce the evidence. The trial court denied the motion, as well as trial counsel's request for permission to file an interlocutory appeal. Trial counsel objected to the testimony at trial. He testified that he believed the testimony was properly admitted, and he decided against raising the issue of its admissibility on direct appeal.

Trial counsel testified that he did not interview either of Petitioner's co-defendants, Jermaine Crawford or Cedric Harris, prior to trial. He testified that he did not subpoena Mr. Crawford or Mr. Harris to testify at trial because he "thought it would be fruitless." Because Mr. Crawford's trial was pending, trial counsel believed that Mr. Crawford would have invoked his Fifth Amendment right, which trial counsel felt could impact the jury in either a negative or a positive way. Trial counsel believed that Mr. Harris' "size and stature [ ] would have hurt our case[.]" Trial counsel portrayed the fight between Mr. Harris and Mr. Adams as "one-sided," and he did "not want the jury to lay eyes on [Mr.] Harris."

Trial counsel testified that he could not recall whether he presented any evidence at Petitioner's sentencing hearing. Trial counsel also did not recall discussing with Petitioner whether Petitioner would testify at the sentencing hearing. Trial counsel testified that he did not attempt to introduce evidence of Petitioner's military service because he believed that "[t]he circumstances that led to [Petitioner's] discharge . . . would not have been favorable." Trial counsel testified that he was familiar with the

statutory mitigating factors. He testified that he did not present evidence at the sentencing hearing to support application of the mitigating factor regarding justification for Petitioner's criminal conduct because he relied on the evidence presented at trial.

Trial counsel testified that he "submitted the claims on appeal that [he] thought contained merit." He testified that he kept a running list during trial of all the possible appealable issues. Trial counsel testified that he did not challenge the sufficiency of the convicting evidence on direct appeal because he believed that the State presented sufficient evidence of second degree murder. He testified that the issue of the sufficiency of the evidence "lacked merit." Trial counsel believed that the issue he raised regarding the prosecutor's statements during closing argument was the strongest issue presented on appeal.

Petitioner testified that trial counsel did not discuss with him the defense of a third party theory. He testified that trial counsel told him that he should only testify if trial counsel did not think they were "winning" the case and that trial counsel informed him that he did not believe Petitioner's testimony at trial was necessary. Petitioner testified that he wanted both of his co-defendants to testify at trial, but trial counsel "never told [Petitioner] whether or not he talked to them." Petitioner testified that he provided trial counsel with a list of witnesses to call at the sentencing hearing, and he provided counsel with "some of [his] military documents," but that trial counsel did not present any of the witnesses or documents at the sentencing hearing. Petitioner testified that trial counsel advised Petitioner not to testify at the sentencing hearing because trial counsel did not "want [Petitioner] to say anything that might harm [him] [o]n appeal." Petitioner testified that trial counsel did not discuss with him what issues trial counsel wanted to include in his appeal. When Petitioner received a copy of the appellate brief, he "was surprised that it [ ] only listed a couple things and they really didn't seem that big a deal except for the whole [State's] closing [argument]."

Petitioner testified that on the date of the offense, he was aware that Mr. Crawford "had an issue that was going on down there[,] and [Petitioner] wanted to know what it was." Petitioner testified that he and Mr. Harris went to the location of the party together. After they arrived, Mr. Harris and Mr. Adams began fighting. Petitioner acknowledged that he shot the victim. On cross-examination, Petitioner agreed with the statement that there was "nothing [his co-defendants] could offer the jury that would exclude the fact that" Petitioner fired the shot that killed the victim.

Cedric Harris pleaded guilty to facilitation of second degree murder. He testified that on the date of the offense, Mr. Crawford called him to say that some people were "trying to jump him" and asked Mr. Harris to pick him up. Mr. Harris denied that Mr. Crawford told him to bring a firearm. When they arrived, Mr. Harris attempted to diffuse

the situation.  He testified that while he was talking to the victim, Shemile Adams "swung at" him.  The two men began fighting, and Mr. Adams kicked him several times in the head and face.  Mr. Harris testified that he was unable to speak, and he did not yell out for anyone to "shoot."  Mr. Harris testified that he was shorter than Mr. Adams, but he outweighed Mr. Adams by 15 or 20 pounds.  Mr. Harris heard gunfire while he "was getting kicked in the face."  Following the gunfire, Petitioner and Jonathan Hughes picked him up and carried him to someone's car.  Mr. Harris testified that he "was in a concussion state."  He testified that he believed Petitioner "saved [his] life[.]"

Mr. Harris testified that he was not contacted by Petitioner's trial counsel or his investigator about testifying at Petitioner's trial.  Mr. Harris testified that he was willing to testify for Petitioner, despite his pending charges, but that he "never heard anything more about it."  Mr. Harris testified that he did not go to the hospital for his injuries.  Mr. Harris acknowledged inconsistencies between his testimony and his statement to the police.  He denied that he wrote the statement to police.

In a written order denying relief, the post-conviction court specifically credited trial counsel's testimony over Petitioner's testimony.  The post-conviction court found that trial counsel thoroughly investigated Petitioner's case and "developed and pursued a reasonable trial strategy which was successful in avoiding a conviction for first degree murder[.]"  The post-conviction court concluded that Petitioner had failed to show by clear and convincing evidence that trial counsel's performance was deficient or that Petitioner was prejudiced by any alleged deficiencies.

*Analysis*

Petitioner contends that his trial counsel was deficient for (1) failing to develop an effective trial strategy; (2) failing to introduce evidence of mitigating factors and advising Petitioner not to testify at his sentencing hearing; and (3) omitting appealable errors on direct appeal.  The State responds that the post-conviction court properly denied post-conviction relief.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution.  T.C.A. § 40-30-103 (2019); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004).  A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence.  T.C.A. § 40-30-110(f) (2019); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009).  "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'"  *Grindstaff v. State*, 297

S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial. *Id*. The stronger the proof of guilt presented at trial, the more difficult it is to prove the prejudice prong of *Strickland*. When proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Randy Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012), *perm. app. denied* (Tenn. Sept. 19, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *Raymond E. McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of item of evidence at trial).

Petitioner contends that trial counsel failed to develop an effective trial strategy by: 1) failing to timely file pretrial motions; 2) failing to present evidence of adequate provocation to support a conviction for voluntary manslaughter; and 3) failing to present

evidence to support defense of a third party. The State responds that the post-conviction court properly denied Petitioner's claims.

***Trial strategy***

Trial counsel testified at the post-conviction hearing that he made a strategic decision to wait to file pretrial motions in order to give the State less of an opportunity to remedy any resulting issues. He testified, "that's been my practice in every jury trial I've had, and I've been successful in jury trials by employing that strategy." Trial counsel was successful in suppressing Investigator Hill's testimony regarding the results of the string tests performed by law enforcement. Petitioner argues that trial counsel's "logic is unreasonable when the outcome of the pre-trial issues leaves counsel without the ability to timely investigate and/or develop a trial strategy." Petitioner also asserts that trial counsel should have presented expert testimony to show that Petitioner did not target or intend to kill the victim. Trial counsel testified, however, that he consulted an independent investigator, and trial counsel considered reconstructing the crime scene, but he determined that it would yield the same results as those of the law enforcement officers and that it would not have been favorable to Petitioner. Moreover, trial counsel had decided not to obtain a crime scene reconstruction expert before the motion to suppress was granted; therefore, the absence of an expert at trial was not related to the timeliness of the motion.

The post-conviction court found that trial counsel "was well prepared for and thoroughly pursued a relevant pre-trial motion plan" and that trial counsel "argued pre-trial motions in a timely manner." Additionally, the post-conviction court found that trial counsel "pursued a reasonable approach in dealing with the evidence of the shooting scene and in not attempting to obtain a crime scene reconstruction expert[.]"

The evidence presented at the post-conviction hearing does not preponderate against the post-conviction court's findings. Petitioner did not present a crime scene reconstruction expert at the post-conviction hearing to establish what favorable information an expert could have provided. In general, when an ineffective assistance of counsel claim is predicated upon trial counsel's failure to present witnesses or introduce evidence, such witnesses' testimony and evidence should be offered at the evidentiary hearing in order for the post-conviction court to determine whether the failure to call a witness or introduce evidence prejudiced the petitioner. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Regarding the motion to suppress testimony about a phone call between Petitioner's co-defendants, Mr. Crawford and Mr. Harris, which the trial court denied, Petitioner asserts that "trial counsel had no time to seek interlocutory review of the

decision and had no time to compel the testimony of the declarants." The post-conviction court found that trial counsel "was not ineffective in not seeking an interlocutory appeal of any pre-trial rulings." In fact, trial counsel sought permission to file an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. Trial counsel testified at the post-conviction hearing that his motion to suppress contained a Rule 9 request for permission to appeal, and his "recollection [was that] it was denied." Petitioner makes no argument and cites no authority to support or establish that interlocutory review of the issue would have been successful or benefitted his defense.

Regarding trial counsel's failure to call Petitioner's co-defendants as witnesses at trial, the post-conviction court found that the co-defendants "faced similar jeopardy and would not likely have testified in [Petitioner]'s trial at a time when each was facing murder charges." Trial counsel testified that he did not interview either of Petitioner's co-defendants. He testified that he did not subpoena Mr. Crawford or Mr. Harris to testify at Petitioner's trial because he "thought it would be fruitless." Trial counsel testified that he believed that Mr. Crawford's attorney would not allow him to testify on behalf of Petitioner while Mr. Crawford's trial was pending, and that Mr. Crawford would have invoked his Fifth Amendment right not to testify, which trial counsel testified, "could have impacted the jury in a positive way or a negative way." Trial counsel also believed that Mr. Harris' large size would have harmed Petitioner's case because trial counsel portrayed the fight between Mr. Harris and Mr. Adams as "one-sided," and he did "not want the jury to lay eyes on [Mr.] Harris."

Finally, Petitioner has not established how their testimony would have benefitted him in his defense. *Black*, 794 S.W.2d at 757. While Mr. Harris testified at the post-conviction hearing that he would have testified at Petitioner's trial despite his pending charges, the trial court implicitly discredited that claim by finding that it was "not persuaded by" Mr. Harris's testimony. Moreover, Mr. Harris's testimony at the post-conviction hearing did not establish any fact that was not presented at trial. He testified that he was on the ground being kicked by Mr. Adams when he heard gunfire. Petitioner has not established how Mr. Harris' testimony would have benefitted him at trial.

Next, Petitioner contends that trial counsel was ineffective for failing to pursue a conviction for voluntary manslaughter as opposed to second degree murder. Petitioner argues the evidence at trial supported a conviction for voluntary manslaughter, but trial counsel failed to make his theory of the case clear to the jury.

Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). It has long been held that murder will be reduced to voluntary manslaughter only when the provocation was caused by the

victim. *See State v. Tilson*, 503 S.W.2d 921, 924 (Tenn. 1974); *State v. Torvarius E. Mason*, No. W2017-01863-CCA-R3-CD, 2019 WL 350756, at *5 (Tenn. Crim. App. Jan. 28, 2019), *perm. app. denied* (Tenn. May 17, 2019).

Petitioner argues that the proof at trial showed that Petitioner "fired the gun aimlessly" after Mr. Harris "had suffered what appeared to be near fatal kicks to the head." Petitioner has presented no evidence that the victim, Mr. Brown, provoked him. There was no evidence that the victim, Houston Brown, was fighting. The post-conviction court found that trial counsel's performance was not deficient, and the evidence does not preponderate against that finding.

Petitioner also contends that trial counsel was ineffective for failing to pursue the theory of defense of a third party. Trial counsel testified that his "position is that under the law it doesn't exist under this set of facts."

Tennessee Code Annotated section 39-11-612 permits a person to use deadly force "to protect a third person" when the person using deadly force "reasonably believes" that the third person would be justified in using deadly force under the self-defense statute and that "the intervention is immediately necessary to protect the third person." "The application of the right to defend another should be 'determined in the same fashion as the right of self-defense' under [T.C.A. section] 39-11-611." *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013) (quoting T.C.A. § 39-11-612 Sentencing Comm'n Cmts.). "A person's right to defense of a third party is no greater than the third party's right to defend himself or herself." *Id*.

The post-conviction court found that trial counsel "discussed with [Petitioner] whether to vigorously pursue a defense of a third party theory," that "the defense of a third party theory would not have succeed[ed] because, at the time of the event, [Petitioner] was not where he had a right to be and was not then engaged in a lawful activity," but nevertheless, the trial court instructed the jury on defense of a third party.

Trial counsel testified that he discussed the defense with Petitioner, but he did not believe that the facts supported the defense, explaining that the victim was not involved in the fight between Mr. Harris and Mr. Adams. Trial counsel requested a jury instruction on the defense to provide the jury with a "lower rung on the ladder." Trial counsel believed that the more effective strategy was to convince the jury that the murder was not premeditated. Trial counsel's decision to focus on negating premeditation was a strategic one made after adequate investigation and preparation, and the post-conviction court properly denied this claim.

*Sentencing*

Petitioner contends that his trial counsel was ineffective for failing to introduce evidence of mitigating factors and for advising Petitioner not to testify at his sentencing hearing. Petitioner asserts that trial counsel effectively "waived" Petitioner's sentencing hearing.

Petitioner testified at the post-conviction hearing that he provided trial counsel with his military documents and a list of possible witnesses at sentencing. However, Petitioner did not present any of those witnesses or introduce the documents at the post-conviction hearing, and the post-conviction court could not speculate as to what favorable information those witnesses or documents could have provided. *Black*, 794 S.W.2d at 757. Trial counsel testified that he did not believe that Petitioner's military documents were favorable, and he did not have any mitigating evidence to present at the sentencing hearing. Trial counsel testified that he relied on the evidence presented at trial to support mitigation based on justification or defense of a third party. Petitioner does not point to any of his own post-conviction testimony that could have benefitted him at sentencing. Accordingly, Petitioner is not entitled to relief.

*Direct appeal*

Petitioner contends that trial counsel, who also represented Petitioner on direct appeal, was ineffective for omitting appealable errors on direct appeal. Specifically, Petitioner asserts that counsel was ineffective for failing to challenge the sufficiency of the evidence to support his convictions.

The post-conviction court found that trial/appellate counsel "was reasonably effective in representing the petitioner on appeal" and that trial counsel "did not appeal on the grounds of insufficient evidence because he concluded that to be a non-meritorious position," finding that "[t]he evidence of guilt was substantial."

The same principles that apply in determining the effectiveness of trial counsel apply when determining the effectiveness of appellate counsel. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995). The petitioner must prove that appellate counsel acted below the range of competence and that but for appellate counsel's performance, there was a reasonable probability that the petitioner's appeal would have been successful. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).

When a claim of ineffective assistance of counsel is premised on the failure to raise an issue, the reviewing court should address the merits of the issue. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise

it." *Id*. The strength of the omitted issue also has bearing on whether failure to raise the issue resulted in prejudice." *Id*.

Trial/appellate counsel testified that he considered whether to raise the issue of sufficiency of the evidence on appeal and decided that the issue had no merit. He testified that he believed the strongest issue was concerning the State's closing argument.

Sufficient evidence exists to support a conviction if, after considering the evidence, both direct and circumstantial, in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

In its opinion on direct appeal, a panel of this court noted that "[t]he State presented lengthy proof at trial from multiple witnesses to support the charge of premeditated first degree murder. However, the jury's verdict of second degree murder renders most of this proof irrelevant to this appeal. . . ." *Golden*, 2017 WL 2482992, at *1. While the panel did not analyze the sufficiency of the convicting evidence, because it was not raised on appeal, the panel noted that "the evidence against [Petitioner] was quite overwhelming" in holding that even if the prosecutor made improper remarks during closing argument, any error was harmless. *Id*. at *5. A witness at the scene testified that she saw a gun in Petitioner's pocket. *Id*. at *1. Another witness testified that Petitioner fired a gun while Mr. Adams and Mr. Harris were fighting, and another witness testified that she saw flashes coming from where Petitioner was standing. *Id*. at *2. The State presented proof that Petitioner made statements to several of his cellmates in which he admitted to firing the shots, and Petitioner did not present any evidence at trial refuting that he fired his gun. *Id*.

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a)(1). Petitioner asserts that second degree murder, "more often than not, involves an identified and targeted victim as well as specific force directed at said victim. . . ." To be guilty of second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death. *See* T.C.A. § 39-11-302(b). A rational jury could have found beyond a reasonable doubt that Petitioner was aware that his conduct of firing a

gun in the direction of the victim was reasonably certain to cause the victim's death. *See e.g. State v. Jakeil Malik Waller*, No. W2015-02361CCA-R3-CD, 2016 WL 7242816, at *1 (Tenn. Crim. App. Dec. 15, 2016), *perm. app. denied* (Tenn. March 9, 2017) (sufficient evidence of second degree murder where the defendant and his brother fired multiple shots into a crowd of people who were watching a fight between two young men, killing two bystanders).

Viewing the evidence in the light most favorable to the State, we conclude that Petitioner's conviction for second degree murder is supported by sufficient evidence, Appellate counsel was therefore not ineffective for omitting this issue for review on appeal.

As to other appealable errors that Petitioner claims counsel was ineffective for failing to raise on appeal, we note that Petitioner has failed to support his assertions with argument, authority, or citations to the record. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived."); Tenn. R. App. P. 27(a)(7).

*Cumulative error*

Petitioner contends that "trial counsel's errors, even if harmless in isolation, had the overall effect of ineffective assistance of counsel[.]" The doctrine of cumulative errors recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). However, this court has held that a petitioner "who has failed to show that he received constitutionally deficient representation on any single issue may not successfully claim that his constitutional right to counsel was violated by the cumulative effect of counsel's errors." *Tracy F. Leonard v. State*, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *21 (Tenn. Crim. App. July 5, 2007), *perm. app. denied* (Tenn. Sept. 13, 2007). Because we have discerned no error in this case, cumulative error analysis does not apply. Petitioner is not entitled to relief on this issue.

CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the denial of the Petitioner's petition for post-conviction relief.

_____
THOMAS T. WOODALL, JUDGE

- 14 -